Exhibit A

2167dohMS

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   JASON DOHERTY,
 4              Plaintiff,
 5          v.                        18 Civ. 10898(NSR)(AEK)
                                      Discovery Conference
 6   PATRICIA BICE, et al.,
 7              Defendants.
 8   ------------------------------x
 9                                    White Plains, N.Y.
                                      June 7, 2021
10
     Before:
11
                THE HONORABLE ANDREW E. KRAUSE,
12
                                      Magistrate Judge
13
                        APPEARANCES
14
     RUSKIN MOSCOU FALTISCHEK P.C.
15        Attorneys for Plaintiff
     E. CHRISTOPHER MURRAY
16
17   OFFICE OF NEW YORK STATE ATTORNEY GENERAL
          Attorneys for Defendants
18   SHAINA SCHWARTZ
19
20
21
22
23
24
25   Digital recording.
```

1              THE DEPUTY CLERK:  This is the matter of Doherty

2     versus Bice, 18 CV. 10898.

3              The Honorable Andrew Krause presiding.

4              Counsel, please state your name for the record,

5     starting with the plaintiff's counsel.

6              MR. MURRAY:  It's E. Christopher Murray, Ruskin Moscou

7     Faltischek, for the plaintiff.

8              THE COURT:  Good morning, Mr. Murray.

9              MR. MURRAY:  Good morning.

10             MS. SCHWARTZ:  Good morning, your Honor.

11             Shaina Schwartz, with the Office of the Attorney

12    General, for defendants.

13             THE COURT:  Good morning, Ms. Schwartz.

14             Okay.  We're here for a conference on the parties'

15    discovery dispute, which was faxed to the production of medical

16    and psychiatric records for the plaintiff.

17             I've reviewed your letters, and I'm going to hear

18    argument on this today.  It is usually my practice to rule on

19    discovery disputes at conferences like this, as I think I

20    earlier explained when we had our first status conference after

21    the matter was referred to me by Judge Román.  I will say at

22    the outset, I'm not sure I'm going to be able to do that with

23    this dispute.  I have a few questions that are not really

24    addressed in the parties' letters, and I may ask you to submit

25    a little bit more about those issues after we talk about them

1    today so that I can be a little bit more informed on them.  But

2    we'll see how it goes.

3           So let me start with you.  It's your application,

4    Ms. Schwartz.  As I said, I've read your letter, so you don't

5    have to recap the letter definitively.  But talk to me a little

6    bit about your position on -- let's start with -- we'll take

7    the two issues in turn.  Let's start with the medical records

8    first, as opposed to the mental health records.

9           MS. SCHWARTZ:  Yes, your Honor.

10           And I think the medical and mental health records, in

11    some ways in this case, overlap a little bit, because it's not

12    entirely clear to us who plaintiff would have seen for autism

13    and the stress that are alleged in the complaint.  So we're

14    happy to address them separately, but they do in some ways

15    overlap, based on the allegations.

16           THE COURT:  And, Ms. Schwartz, I take that point,

17    although I would say that -- and I understand your concerns

18    that it's hard to identify exactly which providers fit into

19    which category, although I do think that the different

20    categories are protected in different ways.  And so it may be

21    the case that you would be entitled to medical records, but not

22    psychotherapy records.

23           For example -- I'm not saying that that's how I plan

24    to rule on this, but there does seem to be a distinction in the

25    case law between how those types of records are evaluated, and

1   it may be that we'll have to understand the nature of the

2   medical/mental health treatment a bit more.  But I'm not sure

3   that they collapse into one another.

4          So you can address them both if you feel that there's

5   enough of an overlap that that's necessary.  But ultimately, I

6   may want to focus a bit more on the distinction because of how

7   it's treated in the cases.

8          I mean, it also strikes me -- and this is part of my

9   question to both of you.  You know, it strikes me that these

10   records are being sought for somewhat different purposes, and

11   that there are certain arguments to be made about them,

12   although I do recognize that there is this overlap.

13          So let me focus your attention on one question to

14   start with, Ms. Schwartz.

15          With respect to the medical records, you point to some

16   cases that say, in sum and substance, that for a plaintiff to

17   sustain an ADA claim, a plaintiff has to come forward with

18   medical proof substantiating the disability.  Right?  That's

19   one of the -- that's in the Grabin case and some of the other

20   cases that you pointed to.

21          One of the responses that Mr. Murray has provided on

22   that is:  Look.  The fact that the plaintiff has a disability

23   is not genuinely in dispute here, because the school had

24   received requests for accommodation from the plaintiff, and he

25   had been classified as a (unintelligible).  He had been

1    classified as a person with a disability when granted the

2    accommodation.

3            So if that's true, how does that affect your argument

4    that you need these records in order to contest, I suppose,

5    from your perspective, the nature -- the fact that the

6    plaintiff has a disability in the first place?

7            MR. MURRAY:  Yes, your Honor.

8            And that's an excellent question.  And I'll give

9    responses sort of two-fold.

10           The first answer is that it seems as though -- not

11   seems as though -- there is a distinction between the diagnosis

12   and the fact that the diagnosis presents an impairment that

13   substantially limits one or more of the major life activities

14   of a certain individual; that is, the standard for disability

15   under the ADA.  And it seems as though the case law in the

16   Second Circuit provides that not all impairments are --

17   impact -- impair or substantially limit one or more major life

18   activities for purposes of ADA litigation and liability.

19           So the fact that plaintiff has a diagnosis and has

20   offered to present documentation or evidence of the diagnosis

21   doesn't actually necessarily carry the day.  It is really the

22   medical evidence.  In the cases both that we've provided and

23   that I'm happy to provide to the Court in, you know, subsequent

24   submission, it's really that the medical evidence is required

25   for evidence of the "substantial limitation" prong for the

1      major life activities.  But plaintiff needs to demonstrate how

2      that impairment substantially limits one or more major life

3      activities.  And that is often what the medical evidence is

4      required of, not that plaintiff had the diagnosis, but in what

5      way it impaired his life activity for the purposes of an ADA

6      analysis.

7              And my second response to your Honor -- as I said, it

8      would be two-pronged.  My second response is that there are --

9      there are cases in this circuit that say that providing

10     evidence of a disability under a standard that's not

11     necessarily the same as the ADA, such as -- well, plaintiff

12     offered what -- his IEP.  It's a different -- it may not be the

13     same standard as a substantial liability for ADA purposes.  And

14     it's also not -- I'm not even exactly sure exactly how one gets

15     an ADA at this time, but it's not -- it's also not medical

16     evidence.

17              THE COURT:  You mean gets an IEP.

18              MS. SCHWARTZ:  Yes.  Sorry.  Yes.

19              The case law talks about medical evidence about that

20     substantial limitation of a life activity, and it's not

21     necessarily medical evidence that plaintiff has offered.

22              And as a third point, you know, what plaintiff has

23     potentially submitted for an IEP, which I haven't seen yet, is

24     also -- we wouldn't have access to everything.  We'd be --

25     defendants would be disadvantaged by not having the full

1    record.  And when we say "medical records," I do want to make

2    clear, we want -- defendants are entitled to medical records

3    sufficiently relevant to the allegations in this case --

4    right? -- medical records and/or psychotherapy records, because

5    they do seem to overlap factually for this particular

6    disability, it seems, related to plaintiff's autism and

7    Asperger's; not necessarily like his whole medical history,

8    just those that are related to what he alleges is the

9    disability for this case, and also what -- the stress that he

10   says he felt as a result of the "no contact" orders.

11            THE COURT:  Right.  Okay.  Thank you, Ms. Schwartz.

12   That's helpful.  And that is what I expected that you would

13   say.

14            In fact, your first and third points would have

15   dovetailed, in my view, because you do seem to be -- I won't

16   use the word "conceding," but sort of accepting, at least, the

17   diagnosis, the diagnostic issue, that plaintiff is referring to

18   in his response letter.  But your point is that you need

19   discovery to go to the question of impact on major life

20   activity, which is, of course, a liability prong.  That needs

21   to be demonstrated in order for there to be liability under the

22   ADA.  It's not sufficient that the plaintiff had a diagnosis.

23   And that makes sense to me.

24            MR. MURRAY:  May I address that, your Honor?

25            THE COURT:  I'm going to give you plenty of

**1**     opportunity to address it, Mr. Murray.  I just want to go

**2**     through a couple of these points.

**3**          But this is part of why I may need further submissions

**4**     on this, because ultimately, this point is not addressed in the

**5**     written submissions, which I understand.  They're short

**6**     submissions, as per my individual practices.

**7**          But the demand, the discovery demand, at issue here,

**8**     at least Document Request Number 23, is "All documents and

**9**     communications concerning plaintiff's disability," which, on

**10**    the surface, is an incredibly broad request in any type of

**11**    case.  And I think, Ms. Schwartz, you even recognize there in

**12**    your last point that that's not exactly what you're looking for

**13**    here.  You're looking for relevant medical records about the

**14**    allegations in this case, and specifically -- not even,

**15**    really -- if I understand you correctly, not even, really, the

**16**    basic question of the diagnosis of Asperger's or autism, but

**17**    medical records that would speak to the issue of how that

**18**    diagnosis or how plaintiff's particular medical condition

**19**    impacts his major life activities in ways that are relevant to

**20**    the allegations in this case.

**21**          So that at the outset, I think we have a much narrower

**22**    type of request here than the one that was propounded, which

**23**    does strike me, as written, as quite broad.

**24**          We'll come back to the psychotherapy point in a

**25**    second, which, again, I understand that there is potentially

2167dohMS

1    some overlap, but I do think that it should be addressed

2    separately.

3            So, Mr. Murray, let me turn to you on those particular

4    points that I have asked about and just followed up on with

5    Ms. Schwartz.

6            MR. MURRAY:  Yes.

7            Autism itself, the diagnosis, goes with a

8    determination that there are impacts on the life activities,

9    the standard for ADA.  And unfortunately, I did not put it in

10   the letter, but I believe there was a court case in the

11   Northern District of New York where the judge initially found

12   that they hadn't established just because he was autistic that

13   he was covered by the ADA.  And I believe -- and I don't want

14   to misrepresent, but I know this for a fact.  I believe there

15   is a Second Circuit case which basically says that autism, in

16   and of itself, diagnosis shows a disability under the ADA.

17           THE COURT:  Mr. Murray, let me stop you there.

18           I don't think that there's -- well, again, I'm not

19   trying to suggest that defendants are conceding anything here.

20   But I don't think that that's the focus of Ms. Schwartz's

21   argument that autism is a covered -- that a person with autism

22   would be covered by the ADA.

23           MR. MURRAY:  But I think --

24           THE COURT:  I accept that point.  And I imagine

25   that -- again, without compelling any actual concessions at

1    this point, I imagine that the defendants would accept that, as

2    well.  But I think it's different than saying that there has

3    been -- you tell me if you disagree with this.  I think it's

4    different than saying that that condition has resulted in a

5    substantial impact on major life activities in the context of

6    this case, because --

7              MR. MURRAY:  I think by definition, it does.

8              THE COURT:  Okay.

9              MR. MURRAY:  Fortunately or unfortunately, disability

10   with autism in an individual that is autistic, the very

11   definition is, you know, an anxiety, the inability to read

12   social cues, you know, the temper tantrums.  The very

13   definition of autism is an impact on the life activities,

14   especially in this case.  I don't think you can sever -- I

15   don't think you can say this individual is autistic, but it's

16   not going to have an impact on his ability to understand the

17   disciplinary process or that he's not going to have anxiety,

18   he's not going to have, you know, difficulty, you know, giving

19   emotional cues.  I think they're too interwound, and I think

20   that -- and so it's not like, okay, the person -- you know,

21   like the cases where they have problems seeing, but they can

22   wear glasses so it corrects it.  Or you know, there may not be

23   an actual impact on their life activities because of -- just by

24   the fact of their diagnosis.  But I think with autism, there is

25   by -- just by the fact of the diagnosis, there is an impact on

1    their daily life activities.  I don't think you can separate

2    the two.

3             I hope I'm being clear.

4             THE COURT:  Yes.  No, I think I do understand your

5    argument, Mr. Murray.

6             I guess the question then becomes -- if that's

7    correct, then I think the question becomes whether or not the

8    actions of the defendant here create liability under the ADA

9    because of the way that the impact was experienced by your

10   client or because of, in your estimation, the failure to take

11   account of the particular disability and how the issuance of

12   "no contact" orders would impact your client.

13            Is that the logic?

14            MR. MURRAY:  Either that would be based on, you know,

15   the actions of the defendant.  They wouldn't be based on

16   plaintiff's classification as autistic.

17            THE COURT:  Well, okay.  But I guess what I'm

18   struggling with a little bit is the notion that the way that

19   the defendants' action impacted the plaintiff is somehow not

20   relevant or not sort of the unique circumstances that are

21   presented by this individual, and how he responded to this

22   action by the defendants is somehow not material to the

23   analysis of whether there's liability.  You seem to be

24   (unintelligible) --

25            MR. MURRAY:  Well, no, I --

1            THE COURT:  -- categorical approach.

2            MR. MURRAY:  I do, but I guess the thing is, the

3    impact would be any autistic individual.  It's not this

4    person's specific medical history.  And I think it would be --

5    you know, it would be our burden, I'd assume, you know, to put

6    in expert testimony saying, you know, because of these

7    activities, an autistic individual feels "X," "Y" and "Z," or

8    is impacted by "X," "Y" and "Z."

9            I do think it's categorical, not individually based.

10   And I actually think that's kind of a ruling from the district

11   court on the claim was that the actions taken by them would

12   have a disproportionate or disadvantaged impact on individuals

13   with autism.  I don't think it's -- so I do think it's

14   categorical.

15            THE COURT:  Okay.  Ms. Schwartz, let me turn back to

16   you just if you have anything to say in response on that point.

17            MS. SCHWARTZ:  You know, your Honor, I appreciate

18   that.

19            I would just say that based on my somewhat limited

20   knowledge of autism, I understand that there's a lot of

21   different ways that folks experience and exhibit autism.  Like

22   I said, I have a very, very basic non-scientific understanding.

23   So it sort of surprises me that you can have a categorical

24   analysis of how it would impact everyone with autism.

25            But my second response is, you know, if plaintiff is

1    going to engage an expert, if that expert is going to consider

2    any of plaintiff's specific medical history, you know, that,

3    again, puts us at a significant disadvantage of not having

4    access to these medical records and to understanding that

5    response.

6            MR. MURRAY:  It wouldn't be based on his medical

7    records.  So I would like to make that representation.

8            THE COURT:  I mean, look.  Certainly, again, I also do

9    not have a deep medical scientific understanding of all of the

10   complexities of an autism diagnosis, and I have only a

11   layperson's understanding of that, as well.

12           But, of course, people with autism are often described

13   as being on a spectrum.  Right?  I mean, that phrase is sort of

14   in the common parlance.  And again, I'm not using that in a

15   medical -- as a medical term.  But I do think it actually is

16   used as a medical term.  And that term alone suggests a range

17   of experiences that people with autism have, based on different

18   situations and circumstances as the nature of their condition

19   and the severity of it and the ways in which it manifests.

20           So again, I mean, the idea of this being a categorical

21   analysis is somewhat surprising to me, although if there is

22   case law to back that up, I'd be curious to see that and

23   interested to know about it.  And so this is, again, one of the

24   reasons why I think additional submissions would be helpful for

25   me on this point.

1          And you know, the idea that there'll be an expert

2     who -- these things go hand in hand, I suppose.  So the idea

3     that there'll be an expert who will testify about the impact of

4     these types of actions, "no contact" orders or disciplinary

5     actions, by university administrators more broadly, and will

6     explain the impact of those actions on people with autism

7     generally, that seems like it's going to be challenging from a

8     number of standpoints.

9          I think everyone would have to agree, based on basic

10    principles of expert discovery, that if the expert -- if the

11    plaintiff's expert were to rely on plaintiff's own medical

12    records, defendants would certainly be entitled to have those.

13    I mean, that's just basic (unintelligible) --

14          MR. MURRAY:  No, I understand that.

15          THE COURT:  -- discovery.  And Mr. Murray understands

16    that, as highlighted by his point that an expert wouldn't be

17    relying on the plaintiff's own medical records.

18          Now, whether that creates a problem for the

19    admissibility of the expert testimony is not a question for

20    today, but it's, again, something that sort of goes hand in

21    hand with the point about there being a categorical analysis

22    here for individuals with autism, as opposed to more of an

23    individualized assessment, given the facts and circumstances of

24    the defendants' alleged actions and the plaintiff's alleged

25    response to those.  So okay.

1           MR. MURRAY:  May I?

2           I mean, I understand the point that if you're going

3    to -- you know, you mentioned the spectrum.  And there is a

4    spectrum, depending on the severity of the autism.  But a lot

5    of that would be covered in the school records, since they have

6    primary jurisdiction or primary responsibility for an

7    individual until they're 21.  And it goes much farther than

8    just, you know, an IEP about extra help.  You know, they make

9    decisions about whether they have to be placed in a residential

10   facility.  They make decisions -- they make -- they

11   basically -- they act as the overseer of the treatment fostered

12   in (unintelligible) classifications and how much needs to be

13   done.  so I do think the school records would probably shed the

14   most light on the severity of his diagnosis as autism.  So I do

15   think that in some ways, that's probably the best source of

16   that information to which we don't have an objection to.  And

17   I --

18           THE COURT:  Let me ask you on that point, Mr. Murray,

19   what do you say to Ms. Schwartz's argument that the EIP process

20   is based on factors that may be distinct from the factors that

21   would be applicable here, and perhaps is not as tied to a

22   medical diagnosis as perhaps the ADA analysis would have to be?

23           MR. MURRAY:  I don't think that's true.  I understand

24   she admitted she has limited, you know, knowledge of it.  But

25   they actually have a psychologist and a doctor to the IEP

1    process that is in charge of the student.  So it's more -- it's

2    much more involved than maybe meets the eye, in the sense that

3    they -- because they ultimately have to make a recommendation

4    if there's going to be placement in a residential facility.

5           THE COURT:  Well, that is consistent with my

6    understanding of the IEP process, is that there is involvement

7    of medical professionals, or at least some type of medical

8    evaluation that is a component of the IEP process, at least at

9    some stage.  So I guess that begs the question a little bit,

10   then, Mr. Murray, why you're -- you have no objection to

11   turning over those records, but more of an objection to other

12   medical records.

13          MR. MURRAY:  Well, I think the two -- I can tell you,

14   from our point of view of the two critical areas:  One, we

15   don't necessarily want to get into his medications; and two,

16   the psychiatric records are probably more sensitive to my

17   client because of, you know, interpersonal and family

18   relationships, and things like that, that may be covered by

19   them.

20          THE COURT:  Well, I understand that point, and that's

21   actually why I wanted to treat these issues somewhat

22   distinctly, despite Ms. Schwartz's point about there being

23   overlap.  And I acknowledge that there may be some overlap in

24   this context.  But I understand the concern and the sensitivity

25   of psychotherapy records in particular.

1          But if you're -- so I guess, then, to come back to

2    your point that you spoke to me on the medical records, if your

3    concern is with respect to medication, I'm not totally sure

4    that that is vital to the defendants' request.  As I said, the

5    request, as written, is overbroad.  And Ms. Schwartz seems to

6    have acknowledged that, at least tacitly, by her framing in her

7    first set of remarks about what the defendants are actually

8    most focused on here.  So I don't know.  It seems like there

9    might be some room for further discussion about that.

10          But coming back to the IEP documentation, is that

11   information that has been produced already, or is that you

12   saying, Mr. Murray, that that is only information that would be

13   available if the defendants were to subpoena that -- those

14   records from (unintelligible) --

15          MR. MURRAY:  They have not been provided.

16          THE COURT:   -- (unintelligible) school records.

17          MR. MURRAY:  I'm sorry.

18          They have not been provided.  I've asked my client to

19   search for -- they do get copies of it.  But I think the

20   thorough records would be in the possession of the school

21   district.  And whether that's something that can just be

22   authorized for them to produce, or whether we would -- as the

23   student we would be able to do that or whether it's something

24   that requires a subpoena, I'm just not sure.  But you know,

25   whatever way is necessary to have them produced, we would

1    cooperate.

2              THE COURT:  Okay.  And, Ms. Schwartz, I think your

3    point is that you don't necessarily think that the IEP records

4    would be sufficient for your purposes or would satisfy your

5    inquiry that is prompting your request for those medical

6    records more broadly.  Although maybe it would.  I don't know.

7    I mean, you haven't had a chance to see those yet.  Right?

8              MS. SCHWARTZ:  No, your Honor, we haven't.

9              And you know, I was going to raise the same point that

10   your Honor raised, in that if there are medical records in the

11   IEP records, if that is a part of the IEP process, including

12   medical records, then there really shouldn't be an objection to

13   similar medical records that are just outside of the IEP

14   process.

15             THE COURT:  Right.  Your request is so broad that it

16   would capture medical records that inevitably would be outside

17   of the IEP process, and that's part of the problem.  I mean, it

18   may be that if your request for medical records was somehow

19   limited to records that are similar to the ones that were

20   provided in the course of the IEP process that there wouldn't

21   be an objection.  Maybe there would still be an objection.  I

22   don't know.  But I think part of the problem with the request

23   is that it's very broad and not tailored, even in the way that

24   you've suggested tailoring it in the course of this discussion.

25             So look.  Maybe there's some -- I know you've met and

1    conferred on this already.  Maybe there is some further meeting

2    and conferring that would be possible to arrive at some sort of

3    agreement on the scope of what medical records could be

4    produced.

5           It sounds as though one of the plaintiff's principal

6    concerns is with respect to his medication history.  I'm not

7    sure medication history is truly relevant to your request,

8    Ms. Schwartz.  And maybe it is, in which case I'll rule on it,

9    and that's fine.  I'm not trying to sidestep my

10   responsibilities here.  But it does sound as though there is

11   potentially some middle ground here.

12          And regardless of what I decide on this, it does seem

13   as though the defendants would be interested in and should

14   pursue the IEP records from the school, especially since

15   there's no objection on the part of the plaintiff to having

16   those documents turned over if he is not able to locate all of

17   them himself.

18          So while I am contemplating this issue, I suggest,

19   Ms. Schwartz, that you pursue those records, because, you know,

20   that may be relevant here to your defenses as much as, if not

21   more so than, the medical records that you're seeking.

22          MR. MURRAY:  I do think, you know, part of our problem

23   was the fact that it was so broad with regard to the medical

24   records.  And you know, it could be broken arm or anything, you

25   know, anything that's irrelevant.  Maybe a consultation between

1    me and Ms. Schwartz would -- we could reach -- if it was

2    narrower, then we could reach an agreement to it.

3            THE COURT:   Okay.  Well, you know, now that we've had

4    this conversation and you've had at least some of my initial

5    thoughts and reactions to it, maybe that will inform your

6    discussions, as well.

7            As I said, as I tell people tongue-in-cheek all the

8    time, I mean, they pay me a salary to resolve disputes.  So

9    it's fine if you are not able to work it out.  It just does

10   seem as though there may be some further negotiation here that

11   would be productive.  And I'll encourage you to have that

12   discussion over the next couple of days while we set deadlines

13   for further submissions.

14           By the way, the submissions are not going to be

15   extensive.  I'm not looking to put you to extraordinary length

16   to tee up these issues.  I just think there are a couple of

17   things that we're going -- that we have covered already and

18   that we will cover with respect to the psychotherapy records

19   that will help me to evaluate the parties' positions on those.

20           All right.  So I mean, in particular, I will say on

21   the "medical records" point, I'm interested in hearing more

22   from each of you about this idea that the application of the

23   ADA to an individual with autism can proceed in a -- in what

24   we've referred to today as a categorical approach, as opposed

25   to a more individually based analysis of the circumstances of a

1    particular plaintiff and how the defendants' alleged action

2    impacted him in this case.  I think that's highly relevant to

3    the question of whether the discovery of medical records for

4    the plaintiff is relevant and proportional to the needs of the

5    case.

6              Also, to the extent you're not able to reach any

7    agreement, Ms. Schwartz, I would ask that you provide me with a

8    narrower version of the request that's at issue here.  Because

9    I will say that the request, as written, is very broad.  And I

10   think in different ways, you've acknowledged that today.  A

11   request that simply says "all documents and communications

12   concerning plaintiff's disability," you know, that doesn't even

13   really -- isn't really even limited to medical records.  As a

14   matter of fact, that could be, you know, anything and

15   everything about all sorts of things from plaintiff's life.  I

16   understand you've represented in your submissions here that

17   you're focused on medical records.  And I expect that was the

18   subject of some of your meet-and-confer negotiations.  But

19   again, as written, that question is just extremely broad.  Even

20   as written, even if it's read to just pertain to medical

21   records concerning plaintiff's disability, that's also still

22   very broad.

23             So in your follow-up submission, Ms. Schwartz, I'd

24   appreciate it if you could give me a more tailored version of

25   that request so I can understand how that would apply.  Because

1    as written, that request is just too broad.

2              But I do understand your point about why you would

3    need some medical records to substantiate or to evaluate your

4    own defenses in this case, your clients' defenses.  And I do

5    take the point that you've made in the cases that you cited

6    about a plaintiff needing to offer medical evidence that

7    substantiates the specific limitations to which he claims he is

8    subject due to his condition.

9              And, Mr. Murray, I mean, you know, you should -- to

10   the extent you haven't done this, you should take a closer look

11   at these cases that are cited in the defendants' letter,

12   because they do stand for this proposition that a plaintiff

13   does have to offer medical evidence substantiating the specific

14   limitation.  So again --

15             MR. MURRAY:  I understand that.

16             DEF. ATTY:  I just want to understand how that --

17             MS. SCHWARTZ:  It's totally different than like, you

18   know, a physical ailment.  And again, you know, I'll be happy

19   to take a look and see if I can find this case that

20   (unintelligible).

21             THE COURT:  And I take your point that this case is

22   different because of the nature of the diagnosis.  And maybe

23   there's cause to substantiate the categorical approach that

24   you've described.  And that's fine.  That will be instructive

25   for me as I continue to think about this case.  So that's

 1    something I'd like you to address in your follow-up submission.

 2          Let's turn to the -- unless anyone else has other

 3    points on the medical records, I'd like to turn to the mental

 4    health records.  But let me just give you each an

 5    opportunity -- I've been talking for a bit -- to weigh in if

 6    there are any final points on the "medical records" issue

 7    before we proceed.

 8          Ms. Schwartz, anything else you'd like to add today?

 9          MS. SCHWARTZ:  No, your Honor.

10          I have a supplemental point, but I think it could go

11    also to the psychotherapy records.

12          THE COURT:  Hold that thought there.  Hold that

13    thought.  But make sure you make the point, because I do want

14    to hear it.

15          MS. SCHWARTZ:  Yes, I will.

16          THE COURT:  And, Mr. Murray, anything you'd like to

17    add on the "medical records" point before we turn to the

18    psychotherapy records?

19          MR. MURRAY:  No.  I think I understand where your

20    interests go -- questions are going to.  So I'm fine.

21          THE COURT:  Okay.  Great.

22          All right.  Let's turn to the mental health question

23    now.

24          And let me start by saying, I understand very well the

25    sensitivity of psychotherapy records and the way that the case

1    law has developed around that sensitivity, and, of course,

2    including the Second Circuit and the Supreme Court have

3    certainly recognized the "psychotherapist patient" privilege

4    and the importance of protecting those records so as to ensure

5    the sanctity of that medical relationship, and to ensure that

6    people can seek mental health treatment and have candid

7    discussions with their mental health providers without concern

8    about those records being disclosed, except in situations where

9    it is truly required and should be necessary.

10          So I start from that principle and understanding at

11   the outset.  I don't think anyone's really disputing that.  The

12   question is whether the mental health records and plaintiff's

13   mental health condition have been put in issue here by the

14   plaintiff.  And I think the parties' letters sort of talk past

15   each other a little bit on this point.

16          Either, Mr. Murray, you focus in your letter on this

17   idea that you -- your client is only seeking garden variety

18   "emotional distress" damages and therefore has not placed his

19   mental and physical -- has not placed his mental health -- I'll

20   just focus on that -- has not placed his mental health at

21   issue.

22          I (unintelligible) cite to Judge Carter's 2016

23   decision in Meefis (phonetic) -- is that pronounced

24   correctly? -- and you know, I think the state of the law on

25   garden variety "emotional distress" damages has evolved over

1  time.  And that is certainly one of the more recent decisions

2  I've seen on that point.

3           But I think that the defendants' argument here is

4  broader than just damages.  I think -- and Ms. Schwartz, you

5  can correct me if I'm wrong.  But my understanding of the

6  defendants' argument is really that the "mental health" issues

7  as pled in the complaint are not really just about damages, but

8  really go to liability.  This may dovetail a bit with the

9  categorical argument that we were talking about earlier.

10          But in looking at the complaint, the amended complaint

11  that you've given, Number 17, and in Paragraph 34, for example,

12  says, "As the result of the issuance of the 'no contact' orders

13  and his disability, plaintiff, Mr. Doherty, suffers great

14  anxiety and depression, has difficulty going to class or

15  utilizing Purchase's facilities for fear of being arrested, and

16  is afraid to socialize with other students."

17          MR. MURRAY:  Right.

18          THE COURT:  Part of the argument is that he is

19  suffering these mental health conditions as the result of the

20  issuance of the "no contact" orders.  And so I take your point,

21  Mr. Murray, that you're representing that your client has not

22  sought any mental health treatment for whatever has come to him

23  for whatever he has experienced as a result of the issuance of

24  the "no contact" orders.  But that is sort of a core element of

25  your complaint, you know.

1          And I'll turn over to Paragraphs 47 and 48, which are

2     cited in the defendants' letter, that "The issuance and

3     existence of the 'no contact' orders create great stress for

4     Mr. Doherty.  And as a result, he has difficulty availing

5     himself of the facilities at Purchase."

6          So either this is -- this to me is not merely a

7     question of damages or "emotional distress" damages, which I

8     understand you've represented you're only seeking garden

9     variety damages, so fine.  But it seems inextricably

10    intertwined with the liability issues.  And that's where I

11    think it gets more complicated on this point.

12         So, Mr. Murray, a lot of that was directed towards

13    you, so I'll let you start on this.

14         MR. MURRAY:  Yes.

15         Well, I think the issue -- as you mentioned, he has

16    not seen anybody with regard to the specific conduct, you know,

17    that's at issue in this case.  So I don't know how records that

18    have nothing to do with these -- you know, the effect of

19    these -- ultimately, his rights, his proof.  And he's going to

20    have to get up there and testify as best he can as to how --

21    you know, what happened.  But if he hasn't seen a mental health

22    provider, what records would be -- would there be to be

23    produced?

24         THE COURT:  Well, I think -- and I'm not going to make

25    Ms. Schwartz's argument for her and she can weigh in herself.

1    But what occurs to me is that one thing the defense would be

2    interested in is records that disprove -- is the idea that

3    Mr. Doherty suffers great anxiety and depression as the result

4    of the issuance of the "no contact" orders.  So that's

5    (unintelligible).

6          MR. MURRAY:  Well, that would be subject to, you know,

7    whatever cross-examination of him and his (unintelligible).

8          THE COURT:  Yes, but that's why you have discovery

9    about that.  If there's a plaintiff who comes in -- just to

10   take a much less complicated and much less fraught by the

11   circumstances, if there is a plaintiff whose leg was broken as

12   the result of a car accident, it is a standard request that a

13   defendant would make in that case to have medical records, at

14   least with respect to any prior injuries to that leg.  Right?

15   And part of the reason for that would be to understand the

16   degree to which lasting damage to the leg was the result of the

17   car accident, as opposed to some pre-existing condition.  It's

18   not to say that the car accident would be excused.  You take

19   your plaintiff as you find him or her.  But it's certainly

20   relevant to the overall picture to understand what prior

21   injuries the plaintiff in that circumstance had to his or her

22   leg.  And so --

23         MR. MURRAY:  I think that's the distinction between

24   garden variety and looking -- I think the courts have held that

25   limiting itself to garden variety doesn't put the entire mental

1    health record of pre-existing actions or what else could have

2    caused an issue.  It's a balancing act that's between

3    priorities.  And I can tell you, you know, I think the death

4    knell of the case is the psychiatric records with regard to his

5    interaction with his family.  And I don't see how if he hasn't

6    come to -- you know, if he hasn't -- if he saw someone and

7    complained about the "no contact" orders and how it's affected

8    his school, then, arguably, yes, that would have to be

9    produced.  But he hasn't done that.

10          So the only thing that they can do is to go back and

11    look at other facets of his emotional health and see if there's

12    some reasons that they mitigate or impact the type of damages

13    of his emotional distress from these incidences.  And that's

14    exactly what I think the courts have held that is not

15    appropriate if there's only garden variety, because then you're

16    basically saying everybody's mental -- even if it's only garden

17    variety, everybody's mental health records are applicable.

18          It's like sexual discrimination.  You accuse someone

19    of, you know, harassment and you seek emotional distress, but

20    you limit it -- you don't -- limiting it to garden variety

21    doesn't allow you to go back and look at every, you know,

22    interpersonal relationship in order to try to cross-examine the

23    person and say, "You know, you did this," or "You didn't do

24    that."  There is a balancing that I think was done by the

25    courts.  And the balancing was that if it's only limited to

1    garden variety, the only testimony that you're going to hear is

2    from the witness as to how they felt by the conduct.

3          There is monetary caps to the type of damages that can

4    be awarded based on only that type of testimony.  And if that's

5    the case, then it's not worth making everybody open up their

6    entire mental health history if they want to allege

7    discrimination or sexual harassment or whatever, because

8    there's a balancing that's done.  And I think even the Supreme

9    Court ruled on that.

10          And here, he's represented that he has not seen

11    anybody for any of the conduct that was at issue in this case.

12    He's only limiting his damages to garden variety.  And I don't

13    think that requires him to open up his entire mental health

14    history with regard to extraneous matters.  And I think that's

15    what the cases have kind of evolved into.

16          THE COURT:  Okay.  And so I appreciate that,

17    Mr. Murray.  And I think that's well argued.

18          I just would say that I understand it in the context

19    of the damages.  What I think is rightly at issue here that's

20    not specifically addressed in your letter or in that argument

21    that you just made is whether there's a different analysis if

22    the damages -- if the mental health allegations go to the

23    liability, to the heart of the liability question.

24          You may say to me that they don't here for "X," "Y"

25    and "Z" reasons.  That's -- ultimately, that's not even the

1    mental health allegations.  Despite the paragraphs I had cited

2    are not -- you don't need to prove anything about his mental

3    health condition post "no contact" order or evaluate his mental

4    health condition pre "no contact" order in order for there to

5    be liability on the ADA claim.  That may be your argument.  You

6    haven't made that argument specifically, but that's okay.  You

7    can go back and think about it a little bit more, and maybe

8    there's some case law on this that you can point me to.

9              You know, I look at that --

10             MR. MURRAY:  (Unintelligible).

11             THE COURT:  Just one second, Mr. Murray.

12             MR. MURRAY:  Sorry.

13             THE COURT:  I look at that In re Sims case, for

14   example, the Second Circuit case that you cited, which is a

15   very thorough discussion by the Second Circuit of these issues.

16   And I was glad to have an opportunity to read that.  I've read

17   it before, but I haven't looked at it in a while.  And one of

18   the distinctions there is that that case is an "excessive

19   force" case.  Right?  It's an "excessive force" case involving

20   an inmate at a New York State correctional facility, I believe

21   who had been pro se, and there are issues of waivers.  And some

22   of the points there are not totally directly relevant to our

23   question here.

24             But one of the things that was discussed there is that

25   in an "excessive force" case and the way that that complaint

1   was framed, there were no issues of emotional distress put at

2   issue.  Emotional distress was not really squarely a point in

3   the complaint.  Things came up in the course of that

4   plaintiff's deposition, and that led to some of the

5   complications and the questions about whether there was a

6   waiver.

7            But you know, going to your point about, you know, not

8   every federal claim necessarily should allow for opening the

9   door to exploration of mental health records, I completely

10  agree with that principle.  But that's a very broadly stated

11  principle.  The harder question is the one before us here,

12  which is:  If the heart of the claim -- and again, if this is

13  the right way to think of the case, and the parties may have

14  different views on this.  They probably do.  But if the heart

15  of the claim depends -- the liability at issue turns on, at

16  least in part, an assessment of the plaintiff -- in this case

17  the plaintiff's mental health, then that's a bit different than

18  just saying it's a damages issue.

19           If the jury would inevitably have to make

20  determinations and evaluations of the plaintiff's mental health

21  as a result of the conduct that's at issue and therefore

22  perhaps have an understanding of what his mental health

23  baseline was prior to this conduct, then that -- it puts us

24  into a different realm of the mental health of the plaintiff

25  being put at issue as part of the underlying claim.  Again,

1    there may be arguments for why that's not the right way to look

2    at this case, and I'm open to those.  That's why I think this

3    is a challenging question and why I'd like further submissions.

4            MR. MURRAY:  I understand.  I think by arguing right

5    now that analogy, if you think of like hostile work

6    environment, you have to show the person's mental state and

7    that they couldn't stand, you know, whatever the conduct was.

8    I don't think that that opens up -- you know, there is an

9    objective standard that's applied, and you don't open up the

10   plaintiff's full mental health history, even though their state

11   of mind is at issue when it comes to liability.

12           But again, you know, I appreciate the opportunity to

13   be able to, you know, make a further submission on this.

14           THE COURT:  Okay.  Thank you, Mr. Murray.

15           Ms. Schwartz, let me turn to you.  You had a point

16   left over from before, which I don't want you to forget.  And

17   then I'd like to hear whatever points you'd like to make about

18   this issue.

19           MS. SCHWARTZ:  Sure.

20           Thank you, your Honor.

21           I think that, you know, our position, as your Honor

22   has identified, is that the stress is not only limited to

23   damages.  It really goes to the heart of liability.  And you

24   know, as such, plaintiff himself has put it at issue.  And this

25   is a little bit where medical and psychotherapy here overlap

1   possibly.  Right?  There is -- it is still our position

2   relevant to his disability like he has not -- his autism.  I

3   shouldn't say his disability.  I should say it's relevant to

4   his autism.  It's not necessarily that plaintiff is saying, you

5   know, "You had these 'no contact' orders, and I was stressed."

6   He's saying that it's the intersection of his autism and the

7   "no contact" orders which gave him such stress that he couldn't

8   access the facilities.

9           So this is where I bring back a little bit that the

10   medical records and the psychotherapy records, plaintiff's put

11   them both at issue if he was treated by a psychotherapist

12   relating to his autism.

13          And you know, there are cases that I will furnish the

14   Court with in subsequent submission where when plaintiff brings

15   an ADA claim for, you know, failure to accommodate

16   disabilities, they put into issue the facts concerning any

17   conditions that form the basis of the disability.

18          And here, this is not a case about a broken leg, where

19   you can sort of clearly divide the medical and the

20   psychotherapy.  Right?  Especially based on what plaintiff's

21   counsel said earlier, that, you know, a lot of autism is

22   wrapped up in somebody's reactions and understanding, and it's

23   sort of necessarily their mental health and psychotherapy

24   records, specifically plaintiff's, that is, I think, part of

25   what plaintiff had put into issue here.  Plaintiff is not just

1    saying, "I broke my leg and I couldn't get into a building."

2    He is saying that "I have this -- I have this diagnosis of

3    autism, and as such, the 'no contact' orders gave me a great

4    amount of stress."  And so the stress is not necessarily

5    divorced from and argue the disability piece still.  And so

6    here's where we come to a little bit more difficult to divorce

7    the two types of records.  Right?  Saying, you know, maybe

8    plaintiff saw a pediatrician for his autism diagnosis, but it's

9    possible that the records pertaining to plaintiff's ADA

10   disability claim include some psychotherapy records.  And so

11   you know, defendants would maintain that it's important to

12   consider how those overlap for plaintiff's ADA claim and for

13   liability.

14           But we didn't want to lose sight of, and we wanted to

15   bring back to the forefront, this idea in considering the

16   psychotherapy records that there are psychotherapy records that

17   could be psychotherapy records based on who plaintiff saw

18   relating to his autism and his purported disability and his ADA

19   claim that -- you know, that may fall under our discussion of

20   the medical records and the relevance to his ADA claim

21   specifically, that because it's not solely potentially a

22   medical injury, there are -- there is a possibility that there

23   are psychotherapy records that are relevant to the ADA claim.

24   And because he's brought an ADA claim, plaintiff has put into

25   issue the facts concerning that.

1            THE COURT:  Okay.  Thank you, Ms. Schwartz.

2            Let me ask you.  You know, Mr. Murray made the point

3    that his client has not seen anybody with respect to -- has not

4    seen any mental health provider with respect to the conduct

5    that's at issue in the complaint.  I mean, he's made that clear

6    in his written submission and again reiterated that point

7    today.

8            I mean, I understand your point and I alluded to it,

9    too, that the issue may be that plaintiff has put his mental

10   health condition at issue on the liability claim, for the

11   reasons that I've mused about, and that you've argued about.

12   But it doesn't seem completely irrelevant at all that he's made

13   this admission that he has not seen anybody for mental health

14   treatment with respect to the "no contact" orders.

15           How does that factor into your analysis of the issue,

16   Ms. Schwartz?

17           MS. SCHWARTZ:  You know, your Honor, it does seem

18   relevant to the discussion of damages and garden variety

19   damages versus larger damages.  But I think I would return to

20   my point originally that plaintiff put his autism and the

21   condition of his autism at issue when he brought an ADA claim.

22           And you know, if plaintiff's going to make the

23   representation that he only saw medical providers for the

24   treatment of his autism, then, you know, that's perhaps a

25   discussion we could have at a different date.  But not -- if

1    plaintiff has seen a psychotherapist for -- I don't know if the

2    word "treatment" is correct, and I don't want to, you know,

3    misuse a term inappropriately.  But for the treatment or, you

4    know, the meetings, you know, or to sort of handle his autism,

5    the autism is the basis of his ADA claim.  And so just because

6    he didn't necessarily seek treatment for the actions that

7    defendants purportedly took, he -- if he has seen a medical

8    provider or a psychotherapist provider relating to his autism,

9    that is still at issue, because he brought an ADA claim.  And

10   there are cases that discuss the fact that when a plaintiff

11   brings an ADA claim, he puts at issue the fact and medical

12   records and circumstances of his disability.

13         And so if plaintiff saw a psychotherapist for his

14   autism, not necessarily specifically for defendants' actions,

15   that is still relevant and put at issue by plaintiff, and

16   therefore, you know, privilege is waived, because he brought

17   that into issue in the autism claim.

18         And we would argue also that he brought the stress and

19   the -- I think the "stress" and "anxiety" were the terms used

20   in the complaint.  Those are the critical allegations of the

21   complaint, is that, you know, plaintiff said that he suffered

22   the stress and anxiety because he had autism, I mean, because

23   of the intersection of the autism and the "no contact" orders.

24   And so in our view, plaintiff put it into issue twice.  Right?

25   If he saw a psychotherapist provider for the treatment of his

1    autism, that put it into issue, because it's an ADA claim.  And

2    therefore, medical history of the condition underlying the ADA

3    claim is relevant.  And that applies, we would argue, not only

4    to medical records, but also to psychotherapy records, because

5    the disability does seem to potentially cover both areas, but

6    also because of the specific allegations in the complaint.  You

7    know, they are so related to plaintiff's mental health that it

8    would be very difficult and really disadvantageous and

9    prejudicial to defendants to not be able to explore that

10   further in discovery.

11              MR. MURRAY:  May I?

12              THE COURT:  Yes, Mr. Murray, you can respond to that.

13              But also, I do have one question to sort of focus on

14   one of the points that Ms. Schwartz just made, which is this

15   idea of whether or not the mental health treatment that -- or

16   counseling that Mr. Doherty received over time was for his

17   autism.  I'm not sure that it's possible to draw that

18   distinction.

19              MR. MURRAY:  That was the point I was making.

20              THE COURT:  Well, okay.  Because I will say, you know,

21   one of the things that you argued here and that I'm sensitive

22   to, frankly, Mr. Murray, is that, you know, one of your

23   client's principal concerns, if not his principal concern, with

24   respect to the mental health records, is revealing or getting

25   into a whole concern about exploring his relationship with his

1    family members.  That to me, at least on the surface, seems --

2              You know, look.  Mental health issues are complicated,

3    and they're intertwined with so many different things, you

4    know, it's hard -- may be hard to parse these things, but maybe

5    you'll tell me it's not that hard.

6              But that set of mental health issues seems, at least

7    arguably, distinguishable from the type of concerns that a

8    person might have to talk to a social worker or a

9    psychotherapist or a psychiatrist or whatever type of mental

10   health provider you might be seeing to manage the challenges

11   and complexities of living life with an autism diagnosis.

12             So can you speak -- are there distinctions to be drawn

13   there?  Is there a bright line?

14             MR. MURRAY:  I think it's hard, as you've indicated,

15   the reason being is like if you go -- if an autistic individual

16   goes to see a psychologist, they're going to talk about, you

17   know, a whole range of things, from girlfriends to family

18   members.  And the fact that the individual has autism kind of

19   underlines that whole type of discussion.

20             I could tell you for autistic individuals that are

21   teenagers how, you know, the interaction with the opposite sex

22   and all that stuff is very complicated, because, you know,

23   they're human beings.  They have the whole range of human

24   emotions at the same time they're autistic, and it's just very

25   hard to separate, as you indicated.

1          Basically, I believe my client has seen three types

2     of -- seen a medical doctor, he's seen a psychiatrist who does

3     the medication, and he sees a psychologist, which is more

4     interpersonal relationships and things like that.

5          I would, you know, since -- seeing that you're going

6     to ask for additional submissions, that will give me an

7     opportunity to talk to my client and try to get as thorough an

8     understanding of what records are out there and what treatments

9     he's received.  But it is just very difficult.  So if you -- if

10    there is a determination that in order to allege a violation of

11    the ADA because someone's autistic that that's going to open up

12    all the records because their autism kind of underlines

13    everything else, that's horrible, from my point of view, just,

14    you know, given this is a pro bono -- you know, it's a group

15    that supports autistic individuals that it would be a very

16    difficult thing.

17         So I would -- you know, I understand you're not going

18    to decide these today.  And I would like to thoroughly address

19    these issues more so than what we've done, just because they

20    are important and important to this case, and I think

21    otherwise, too.

22         THE COURT:  Yes.  Thank you, Mr. Murray.

23         You know, I really have not had -- I don't think we've

24    had any cases together, either you, Mr. Murray, or

25    Ms. Schwartz.

1    I do rule on most discovery disputes at conferences

2  like this, because the vast majority of discovery disputes are

3  relatively -- I don't want to say "routine," because I don't

4  want to diminish the importance of them to litigants in those

5  cases.  But there are things that we see over and over and

6  over.  There are issues that are relatively straightforward,

7  and even -- sometimes even include the production of

8  psychotherapy records, because sometimes the law is more black

9  letter on these points one way or the other.

10    But I think this case presents some sensitivities and

11  challenges.  And I think I would benefit from additional

12  briefing from the parties.  I appreciate the arguments.  I know

13  we spent a good amount of time together this morning already,

14  and we'll wrap up here shortly.  I have another proceeding to

15  follow.  But I really do appreciate the arguments that you've

16  made.  And it's further re-enforced for me the need to have

17  further briefing, because I think there are subtleties here

18  that I'd like to spend some more time thinking through before

19  issuing a ruling.

20    So what I am going to do is -- I also am going to

21  encourage you -- I mean, we talked about this with respect to

22  the medical records.  But I think that you should have further

23  discussions about the mental health records, as well, if only

24  to see if there are potential grounds where the parties could

25  reach some sort of agreement.  Because I take Mr. Murray's

1    point that his client has some particular concerns and

2    sensitivities about medical records and mental health records.

3    In the mental health context, those concerns may predominate

4    and may make it impossible to have a middle ground.  But on the

5    medical records, it feels like there's more of a possibility

6    that you might have some way to meet in the middle.  But we'll

7    see.

8              I just will ask that you spend a little time this week

9    thinking through this issue on your own.  And Mr. Murray should

10   also have an opportunity to discuss with his client.  And then

11   you should have at least one more meet-and-confer session about

12   this, in light of everything we've talked about today and in

13   light of anything Mr. Murray can learn from further discussions

14   with Mr. Doherty, and see if there's a way to narrow the

15   issues.  And if so, you can then present that to me in your

16   written submissions.

17             So what I'm going to ask is that the defendants file a

18   supplemental submission.  I'm going to limit it to five pages.

19   I think that should be enough to tease out the issues,

20   especially given what we've talked about today.

21             If you feel, Ms. Schwartz, that that's really not

22   enough and you need a little bit more space, let me know.  But

23   I don't want this to be a massive undertaking for you, because

24   I think we've framed the issues pretty well here today, and

25   narrowed it down.  I think you understand the things I'm most

1    focused on.

2              So is that something -- I'd like that within a week

3    from today, by next Monday, the 14th.  And then give Mr. Murray

4    a week to respond.  Is that going to work for you,

5    Ms. Schwartz?

6              MS. SCHWARTZ:  You know, your Honor, I'm happy to do

7    that.  And I appreciate your Honor giving us the opportunity to

8    do that.  If it's possible to do it with just a few more days,

9    perhaps the 16th, just to give myself and Mr. Murray a little

10   bit more time to meet and confer, and then, you know, for me to

11   actually put together the submission based on that

12   meet-and-confer, rather than, you know, starting to work on the

13   submission given the time restriction today and not being able

14   to tailor based on the potential meet-and-confer, that would be

15   greatly appreciated.

16             THE COURT:  Yes.  And that's why I asked instead of

17   just directing.  I'm going to give you -- I'll give you -- with

18   the thought that you'll spend some time this week meeting and

19   conferring, I'll make the deadline for your submission the

20   18th, Ms. Schwartz.

21             And then, Mr. Murray, we'll make your response

22   July 2nd, with the thought that you might also need more time

23   to discuss with your client after you see Ms. Schwartz's

24   letter, you know, to see if there's further information you

25   need from him in order to prepare your response.  And also

1    (unintelligible) that July 2nd is running right up into the

2    holiday, so you might want to submit it a day or two earlier

3    than that if that works better for your schedule.

4                MR. MURRAY:  Yes.  (Unintelligible) sort it out,

5    so . . .

6                THE COURT:  Right.  But I think it will require some

7    active discussion with your client, both now and then in

8    response to Ms. Murray's -- excuse me -- Ms. Schwartz's

9    submission.

10                So we'll have the plaintiff letter -- sorry.  We'll

11    have the defendants' letter June 18th, the plaintiff's letter

12    July 2nd.  And I will try to get you a ruling on that very

13    promptly thereafter.

14                I know that we have some discovery deadlines coming up

15    in this case.  I'm hopeful that -- you know, obviously, this

16    will have a significant impact on the deposition of the

17    plaintiff.  So I realize that that is not going to be completed

18    within the current time frame for depositions, which is

19    June 30th.

20                I know that's someone dialing in for our eleven

21    o'clock.

22                I'm just finishing up a prior proceeding.

23                But I'm hopeful that you can continue to move forward

24    with scheduling of other depositions.  I know that this is

25    going to take some time, but you should continue to push

1     forward with other things in this case that you can accomplish

2     while you wait for a decision on this particular issue.

3                 MR. MURRAY:  Okay.

4                 MR. ULRICH:  This is Don Ulrich, your Honor.

5                 THE COURT:  Okay, Mr. Ulrich.  We're just finishing up

6     our prior proceeding.  So just hold on one second.  Okay?

7                 MR. ULRICH:  Yes.

8                 THE COURT:  Thank you.

9                 MS. SCHWARTZ:  Your Honor, could I put in one more

10    very brief request?  I'm so sorry.  A challenge on the

11    scheduling.  I am -- could I just request a schedule -- a

12    deadline for defendants' letter to be the 21st rather than the

13    18th?  Is that possible?

14                THE COURT:  Yes.  That's fine.

15                MS. SCHWARTZ:  Thank you.  I appreciate it.

16                MR. MURRAY:  You don't need to -- I can still do the

17    7/2 date.

18                THE COURT:  Okay.  Perfect.  That's perfectly fine.

19                Thank you.

20                And we will have you back in -- I'm going to issue a

21    written decision on this.  But we'll have you back in for a

22    conference shortly thereafter to take stock of where things

23    stand in discovery, and see if any adjustments need to be made

24    to the schedule.  I'm not going to schedule that conference

25    right now.  I'll schedule it once we have a ruling on this

1    issue.

2              But again, I know we have a June 30th deadline for

3    fact deposition.  I'm going to just -- as part of the minute

4    entry for today's proceeding, we're going extend that deadline

5    to July 31st, which is the same deadline you have for some

6    other things in this case discoverywise.  So that way, you

7    don't have to send me a separate letter asking to adjourn the

8    6/30 deadline, because, obviously, you're not going to be able

9    to complete all depositions while this issue is still

10   percolating.

11             So we'll extend that to July 31st.  We'll keep all the

12   other dates the same, with the idea that we'll have you back in

13   for a conference before July 31st to assess where things stand.

14             But again, I don't think this should prevent you from

15   taking the depositions of the defendants.  And so hopefully,

16   those can move forward, even while you're waiting for me to

17   decide this issue.

18             Okay.  I think that covers everything for today.

19             And again, thank you for your thoughtful letters and

20   arguments today.  It's given me a lot to consider, and I

21   appreciate that.

22             Is there anything further we should address today from

23   the plaintiff's perspective, Mr. Murray?

24             MR. MURRAY:  No.  No, your Honor.

25             THE COURT:  All right.  Anything further from the

2167dohMS

| | |
|---|---|
| 1 | defendants' perspective, Ms. Schwartz? |
| 2 | MS. SCHWARTZ:  Not here, your Honor. |
| 3 | Thank you so much. |
| 4 | THE COURT:  Okay.  Thank you both. |
| 5 | I'll look forward to your submissions.  And we'll let |
| 6 | you know about a next conference date. |
| 7 | We will stand adjourned for today. |
| 8 | Please stay safe and stay healthy, everybody.  Take |
| 9 | care. |
| 10 | MR. MURRAY:  Thank you. |
| 11 | MS. SCHWARTZ:  Thank you. |
| 12 | -   -   - |